COMMISSIONER OF CORPORATIONS AND TAXATION *vs.*
WOBURN NATIONAL BANK
(and a companion case between the same parties).

Suffolk.   May 8, 1940. — February 28, 1944.

Present: FIELD, C.J., DONAHUE, LUMMUS, QUA, DOLAN, & WILKINS, JJ.

*Taxation,* National bank, Compromise.   *National Bank.   Election.
Accord and Satisfaction.   Contract,* What constitutes, Consideration,
Validity, Compromise.

Review by LUMMUS, J., of statutes and decisions respecting taxation by
this Commonwealth of property of, income of, and shares in national
banks.

Elections and agreements by a national bank in 1924 after the effective
date of St. 1924, c. 233, and in 1925 "to be taxed in and for" those
years "upon its net income in accordance with the provisions of"
§ 10A of G. L. c. 63 as amended, "in lieu of the tax provided by" § 1
of c. 63 as amended, were in their essence acceptances of offers by
the Commonwealth of compromises by which the bank was freed
from the uncertainties and possible long and expensive controversies
involved in assessments under said § 1; and thus valid contracts upon
sufficient consideration were established which deprived the bank of
standing to claim abatements of assessments made under § 10A as
amended in accordance with such elections and agreements although
the assessments so made were not within those permitted upon national
banks by § 5219 of U. S. Rev. Sts. as amended.

APPEALS from decisions by the Appellate Tax Board
abating taxes assessed upon the appellee as described in
the opinion.

The cases were argued at the bar in May, 1940, before
*Field,* C.J., *Lummus, Dolan,* & *Cox,* JJ., and after the
retirement of *Cox,* J., were submitted on briefs to *Donahue,
Qua,* & *Wilkins,* JJ.

*O. V. Fortier,* Assistant Attorney General, for the com-
missioner of corporations and taxation.

*K. L. Johnson,* for the taxpayer.

LUMMUS, J.   These are petitions, concerning taxes as-
sessed in the years 1924 and 1925 respectively, brought
under G. L. (1921) c. 63, §§ 77, 78, as amended (now re-

pealed by St. 1930, c. 416, § 2), by a national banking association, asking the Supreme Judicial Court to adjudge those taxes (assessed under statutes then existing and paid under written protest) illegally exacted, to the end that the amount thereof might be repaid out of the treasury of the Commonwealth. On May 20, 1938, a single justice transferred the petitions under St. 1930, c. 416, § 33, to the Appellate Tax Board created by St. 1937, c. 400, to take the place of the former Board of Tax Appeals. The powers of the Appellate Tax Board are found in G. L. (Ter. Ed.) c. 58A, as amended. On November 22, 1939, the Appellate Tax Board abated the taxes on the ground that they were illegally exacted. On December 8, 1939, the respondent commissioner appealed to this court, as provided by G. L. (Ter. Ed.) c. 58A, § 13, as last amended by St. 1939, c. 366, § 1.

Without Congressional permission a State has no right to impose a tax directly upon an instrumentality or agency of the United States such as a national bank. *Owensboro National Bank* v. *Owensboro*, 173 U. S. 664. *First National Bank* v. *Adams*, 258 U. S. 362. *Penn Dairies, Inc.* v. *Milk Control Commission of Pennsylvania*, 318 U. S. 261, 269. *Maricopa County* v. *Valley National Bank*, 318 U. S. 357. *Mayo* v. *United States*, 319 U. S. 441. But "a national bank is subject to state law unless that law interferes with the purposes of its creation, or destroys its efficiency, or is in conflict with some paramount federal law." *Lewis* v. *Fidelity & Deposit Co. of Maryland*, 292 U. S. 559, 566. *First National Bank* v. *Commissioner of Corporations & Taxation*, 279 Mass. 168, 172. *Milk Control Board* v. *Gosselin's Dairy, Inc.* 301 Mass. 174. Whether a State has a right to tax stockholders in national banks on their shares in the absence of Congressional prohibition (*Flint* v. *Aldermen of Boston*, 99 Mass. 141, 145), or, as more commonly said, has no such right in the absence of Congressional permission (*Des Moines National Bank* v. *Fairweather*, 263 U. S. 103, 106; *Iowa-Des Moines National Bank* v. *Bennett*, 284 U. S. 239, 244; *Union Bank & Trust Co.* v. *Phelps*, 288 U. S. 181, 186, 187; *Central National Bank* v. *Lynn*, 259 Mass. 1, 13), is of merely academic interest, for Congress has long pro-

hibited State taxation of national bank shares except under rigid restrictions which undoubtedly it had a constitutional right to impose. *Bank of California* v. *Richardson*, 248 U. S. 476, 483. *First National Bank* v. *Hartford*, 273 U. S. 548, 550. *Union Bank & Trust Co.* v. *Phelps*, 288 U. S. 181, 186, 187. *Federal Land Bank* v. *Bismarck Lumber Co.* 314 U. S. 95. As was said in *First National Bank* v. *Anderson*, 269 U. S. 341, 347, "National banks are not merely private moneyed institutions but agencies of the United States created under its laws to promote its fiscal policies; and hence the banks, their property and their shares cannot be taxed under state authority except as Congress consents and then only in conformity with the restrictions attached to its consent."

Soon after the national banking system was established by the Act of February 25, 1863, c. 58 (12 U. S. Sts. at Large, 665),[1] which contained no provision for State taxation of shares (*Van Allen* v. *Assessors*, 3 Wall. 573, 582), Congress revised that act by the Act of June 3, 1864, c. 106, and by § 41 of the revised act (13 U. S. Sts. at Large, 99, 112), the material part of which is reprinted in a footnote in 99 Mass. at 142, permitted certain State taxation of national bank shares. That section was amended by Act of February 10, 1868, c. 7 (15 U. S. Sts. at Large, 34), to make clear that the word "place" in that section meant "State," as had been decided in *Austin* v. *Aldermen of Boston*, 14 Allen, 359. The text of the 1868 amendment appears in *Providence Institution for Savings* v. *Boston*, 101 Mass. 575, 581. Those two acts, with respect to § 41, were combined in U. S. Rev. Sts. (1873) § 5219, which read as follows: "Nothing herein shall prevent all the shares in any [national banking] association from being included in the valuation of the personal property of the owner or holder of such shares, in assessing taxes imposed by authority of the State within which the association is located; but the legislature of each State may determine and direct

---

[1] During the Civil War State banks were driven out of existence by heavy taxation. *Veazie Bank* v. *Fenno*, 8 Wall. 533. Nichols, Taxation in Massachusetts (3d ed. 1938) 552, 561.

the manner and place of taxing all the shares of national banking associations located within the State, subject only to the two restrictions, that the taxation shall not be at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such State, and that the shares of any national banking association owned by non-residents of any State shall be taxed in the city or town where the bank is located, and not elsewhere. Nothing herein shall be construed to exempt the real property of associations from either State, county, or municipal taxes, to the same extent, according to its value, as other real property is taxed." This section remained without amendment until 1923.

A summary of the decisions interpreting § 5219, found in *First National Bank* v. *Anderson*, 269 U. S. 341, 347, 348, is quoted in a footnote.[1] Under that section, a citizen of Massachusetts could not lawfully be taxed here upon his shares in a national bank located outside the Commonwealth. *Flint* v. *Aldermen of Boston*, 99 Mass. 141. But

---

[1] "The restriction on the taxation of the shares often has been considered by this Court. The earlier decisions have been reviewed from time to time in later cases, and all, taken collectively, may be summarized as showing, so far as is material here, 1. The purpose of the restriction is to render it impossible for any State, in taxing the shares, to create and foster an unequal and unfriendly competition with national banks, by favoring shareholders in state banks or individuals interested in private banking or engaged in operations and investments normally common to the business of banking. . . . 2. The term 'other moneyed capital' in the restriction is not intended to include all moneyed capital not invested in national bank shares, but only that which is employed in such way as to bring it into substantial competition with the business of national banks. . . . 3. Moneyed capital is brought into such competition where it is invested in shares of state banks or in private banking; and also where it is employed, substantially as in the loan and investment features of banking, in making investments, by way of loan, discount or otherwise, in notes, bonds or other securities with a view to sale or repayment and reinvestment. . . . 4. The restriction is not intended to exact mathematical equality in the taxing of national bank shares and such other moneyed capital, nor to do more than require such practical equality as is reasonably attainable in view of the differing situations of such properties. But every clear discrimination against national bank shares and in favor of a relatively material part of other moneyed capital employed in substantial competition with national banks is a violation of both the letter and spirit of the restriction. . . ."

To invalidate State taxation of national bank shares, the existence of competing moneyed capital less heavily taxed had to be proved. *First National Bank* v. *Hartford*, 273 U. S. 548, 552. *Minnesota* v. *First National Bank*, 273 U. S. 561. *First National Bank* v. *Louisiana Tax Commission*, 289 U. S. 60, 64, 65, 87 Am. L. R. 840, 844, 845. *Tradesmens National Bank* v. *Oklahoma Tax Commission*, 309 U. S. 560, 567, 568. *Peoples National Bank & Trust Co.* v. *County of Westchester*, 261 N. Y. 342.

a nonresident could be taxed in Boston upon his shares in a Boston national bank. *Providence Institution for Savings v. Boston,* 101 Mass. 575. See also *Schuylkill Trust Co. v. Pennsylvania,* 302 U. S. 506, 514, et seq. In *Owensboro National Bank* v. *Owensboro,* 173 U. S. 664, 669, in deciding that a State tax on the property, assets or franchises of national banks was invalid, the Supreme Court said, "This section [5219], then, of the Revised Statutes is the measure of the power of a State to tax national banks, their property or their franchises. By its unambiguous provisions the power is confined to a taxation of the shares of stock in the names of the shareholders and to an assessment of the real estate of the bank. Any state tax therefore which is in excess of and not in conformity to these requirements is void."

Prior to 1873 a statute of this Commonwealth purported to impose upon "every bank" a tax of one half of one per cent of the amount of its paid-in stock. Gen. Sts. (1860) c. 57, §§ 89, 90. Those sections, if applied to national banks, were plainly in conflict with the Federal statutes already mentioned, and were omitted from the Public Statutes of 1882 on the ground that they were superseded by St. 1873, c. 315. See Nichols, Taxation in Massachusetts (3d ed. 1938) 551 et seq.

In addition, shares in banks as well as in other corporations were originally assessed to the owner in the city or town where he lived. Gen. Sts. (1860) c. 11, § 12. *Dwight v. Springfield Centre Fire District,* 11 Met. 374. *Tremont Bank* v. *Boston,* 1 Cush. 142. *Murray* v. *Berkshire Life Ins. Co.* 104 Mass. 586. *Goldsbury* v. *Warwick,* 112 Mass. 384. *Rich* v. *Packard National Bank,* 138 Mass. 527, 530. The same practice was continued as to national bank shares by St. 1865, c. 242.[1] The fact that the rate of taxation in different municipalities varied greatly was held not a viola-

---

[1] But by St. 1868, c. 349, § 1, and St. 1872, c. 321, § 5, such shares owned by nonresidents were made taxable in the city or town where the bank was located. And by St. 1864, c. 208, a franchise tax was substituted for the local taxation of shares in the case of many corporations as a "means of reaching the stock of non-residents and of residents who by one means or another escaped taxation." Nichols, Taxation in Massachusetts (3d ed. 1938) 224.

tion of the Federal statute.[1]   *Providence Institution for Savings* v. *Boston,* 101 Mass. 575.   But after some vacillation (St. 1871, c. 390; St. 1872, c. 321) the policy of taxing both State and national bank shares to their owners in the city or town in which the bank was located was adopted for all cases by St. 1873, c. 315, except that real estate was assessed to the bank wherever situated, and its value was deducted in reckoning the value of the shares.   The rate of taxation was to be the same as that "at which other moneyed capital in the hands of citizens and subject to taxation is by law assessed."   That rate was the general local rate of taxation.   The bank was required to pay the taxes assessed upon its stockholders, as the statutory agent of the stockholders (*A. J. Tower Co.* v. *Commonwealth,* 223 Mass. 371, 373), and as such might petition for abatement or contest the validity of the taxes (*National Bank of Commerce* v. *New Bedford,* 155 Mass. 313, 316, 317; *Hills* v. *Exchange Bank,* 105 U. S. 319; *Schuylkill Trust Co.* v. *Pennsylvania,* 296 U. S. 113, 118), and was given a lien upon the shares for reimbursement.   The imposition upon the bank of the duty to pay the taxes was held not to violate the Federal statute.   *Merchants' & Manufacturers' Bank* v. *Pennsylvania,* 167 U. S. 461, 466.   *Des Moines National Bank* v. *Fairweather,* 263 U. S. 103, 111, 112.   *Colorado National Bank* v. *Bedford,* 310 U. S. 41, 52, 53.   The benefit of the taxes was given to the several cities and towns in which the shares were owned by residents of the Commonwealth.   All other local taxation of such shares was ended.   *Little* v. *Little,* 131 Mass. 367.

In substance this system continued in force and was incorporated in G. L. (1921) c. 63, §§ 1–10.   It was held constitutional and not in conflict with the Federal statute in *Bank of Redemption* v. *Boston,* 125 U. S. 60.   See also *A. J.*

---

[1] In the Final Report of the Commission to Investigate the Operation of the Laws relative to the Taxation of Certain Banking Institutions, 1925 House Doc. 233, page 15, it is said that "in different localities there are tax rates varying from $15 to $43" on $1,000.   In 1916 "the average tax rate was then about eighteen dollars per thousand" (Nichols, Taxation in Massachusetts [3d ed. 1938] 557), and a tax on intangibles at the local rate "amounted frequently to from 30 to 50 per cent of the income."   Ibid. 467.   See also *Welch* v. *Brown,* 283 Mass. 467, 473.

*Tower Co.* v. *Commonwealth,* 223 Mass. 371, 376; *Des Moines National Bank* v. *Fairweather,* 263 U. S. 103.

In the present century many States changed from a system of taxing locally intangibles owned by individuals by ad valorem property assessments, and adopted systems of taxes on the income from intangibles. For the history of this change in Massachusetts, see Nichols, Taxation in Massachusetts (3d ed. 1938) 223–226, 463, et seq. With the advent of State income taxes on individuals in Massachusetts, a new question was presented as to the conformity to § 5219 of our system of taxes on national bank shares. Under Amendment 44 to our Constitution, ratified on November 2, 1915, an income tax was provided by St. 1916, c. 269, which in substance became G. L. (1921) c. 62. By that statute, interest upon bonds, notes, money at interest, and debts (except savings bank deposits, bonds of the United States, mortgage loans upon real estate, and some others), and dividends upon shares of corporations not organized under the laws of Massachusetts (except national banks and foreign corporations subject here to a franchise tax), received by individual inhabitants of Massachusetts, became taxable at six per cent. Personal property, the income of which was subjected to the income tax, was made exempt from local property taxes.[1]

---

[1] The original income tax statute (St. 1916, c. 269, § 2 [b]) expressly exempted dividends on shares in "national banks." See also St. 1920, c. 352. But in G. L. (1921) c. 62, § 1 (b), this was changed to read "banks the shares of which are subject to taxation under" G. L. (1921) c. 63, § 1, and thus included both State and national banks. If national banks could no longer be taxed under that section after the enactment of the income tax, it might have been argued that the language of G. L. (1921) c. 62, § 1 (b), brought the income within the income tax. Such an argument might find support in the principle, later established, that a State may impose a nondiscriminatory tax upon income derived from the United States or one of its agencies. *Commissioner of Corporations & Taxation* v. *Flaherty,* 306 Mass. 461, 464; certiorari denied, 312 U. S. 680. *Helvering* v. *Gerhardt,* 304 U. S. 405, 413. *Graves* v. *New York,* 306 U. S. 466. *State Tax Commission* v. *Van Cott,* 306 U. S. 511. *Oklahoma Tax Commission* v. *United States,* 319 U. S. 598, 603, 610. But there are several answers to such an argument. (a) It could not be said that national bank shares could not be taxed under G. L. (1921) c. 63, § 1, at some rate, as appears later in this opinion. (b) Section 5219 was apparently designed to regulate completely taxation in connection with national banks. *Bank of California* v. *Richardson,* 248 U. S. 476, 483. *Buder* v. *First National Bank,* 16 Fed. (2d) 990. (c) The change was one made in a periodical revision, and such a change ordinarily is not intended to make any substantial alteration in the law. *Medford Trust Co.* v. *McKnight,* 292 Mass. 1, 28.

Primarily § 5219 protected shares in national banks from taxation that discriminated against them in favor of competing individuals who enjoyed more favorable rates of taxation. *Merchants' National Bank* v. *Richmond*, 256 U. S. 635. "The words of the federal statute 'do not embrace any moneyed capital . . . except that in the hands of individual citizens. This excludes moneyed capital in the hands of corporations, although the business of some corporations may be such as to make the shares therein belonging to individuals moneyed capital in their hands.' *Mercantile Bank* v. *New York*, 121 U. S. 138, 156." *A. J. Tower Co.* v. *Commonwealth*, 223 Mass. 371, 375, 376. Shares in competing corporations, however, might be "other moneyed capital in the hands of individual citizens" within § 5219. *Amoskeag Savings Bank* v. *Purdy*, 231 U. S. 373. *Minnesota* v. *First National Bank*, 273 U. S. 561. *Montana National Bank* v. *Yellowstone County*, 276 U. S. 499. *Iowa-Des Moines National Bank* v. *Bennett*, 284 U. S. 239.

It was and is common knowledge that the ad valorem tax on $1,000 of fair cash value in national bank stock (disregarding real estate held by the bank and taxable locally where situated) under G. L. (1921) c. 63, § 1, at the general local rate of taxation would generally much exceed in amount the tax under the income tax law of six per cent of the income of $1,000 otherwise invested.[1] That being the case, if there was in fact "other moneyed capital in the hands of individual citizens" being used in competition with national banks, there was a likelihood that the taxation of national bank shares locally at the general local rate of taxation would be held unlawful as a violation of § 5219. This was recognized by the then Attorney General in an opinion given to the House of Representatives on April 12,

(d) At the time of the change a State tax on the income of a Federal agency was thought to be unconstitutional, and consequently was doubtless not intended. *Mississippi State Tax Commission* v. *Brown*, 188 Miss. 483, 127 Am. L. R. 919.

[1] See footnote, *ante*, 510. In the Final Report of the Commission to Investigate the Operation of the Laws relative to the Taxation of Certain Banking Institutions, 1925 House Doc. 233, page 11, it is said, "The result [of the income tax] has been that other moneyed capital was taxed about one fifth to one sixth the amount of tax imposed on the national bank share."

1923 (1923 House Doc. 1441). See also *Central National Bank* v. *Lynn*, 259 Mass. 1, 3, 10, 12. Much litigation arose over this question. The history of it is narrated in Nichols, Taxation in Massachusetts (3d ed. 1938) 557–560; Opinion of the Attorney General, *ubi supra*.

There was pressure upon Congress from Massachusetts and other States having income tax laws to liberalize § 5219 so as to validate State legislation. By the Act of March 4, 1923, c. 267 (42 U. S. Sts. at Large, 1499), § 5219 was amended into the form set out in a footnote.[1] The amendment permitted two kinds of State taxation upon an owner of national bank shares, (a) a property tax on the shares, as allowed before the amendment, and (b) an income tax on dividends at a rate no higher than that assessed upon

---

[1] "Sec. 5219. The legislature of each State may determine and direct, subject to the provisions of this section, the manner and place of taxing all the shares of national banking associations located within its limits. The several States may tax said shares, or include dividends derived therefrom in the taxable income of an owner or holder thereof, or tax the income of such associations, provided the following conditions are complied with:

"1. (a) The imposition by said State of any one of the above three forms of taxation shall be in lieu of the others.

"(b) In the case of a tax on said shares the tax imposed shall not be at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such State coming into competition with the business of national banks: *Provided,* That bonds, notes, or other evidences of indebtedness in the hands of individual citizens not employed or engaged in the banking or investment business and representing merely personal investments not made in competition with such business, shall not be deemed moneyed capital within the meaning of this section.

"(c) In case of a tax on the net income of an association, the rate shall not be higher than the rate assessed upon other financial corporations nor higher than the highest of the rates assessed by the taxing State upon the net income of mercantile, manufacturing, and business corporations doing business within its limits.

"(d) In case the dividends derived from the said shares are taxed, the tax shall not be at a greater rate than is assessed upon the net income from other moneyed capital.

"2. The shares or the net income as above provided of any national banking association owned by nonresidents of any State, or the dividends on such shares owned by such nonresidents, shall be taxed in the taxing district where the association is located and not elsewhere; and such associations shall make return of such income and pay the tax thereon as agent of such nonresident shareholders.

"3. Nothing herein shall be construed to exempt the real property of associations from taxation in any State or in any subdivision thereof, to the same extent, according to its value, as other real property is taxed.

"4. The provisions of section 5219 of the Revised Statutes of the United States as heretofore in force shall not prevent the legalizing, ratifying, or confirming by the States of any tax heretofore paid, levied, or assessed upon the shares of national banks, or the collecting thereof, to the extent that such tax would be valid under said section."

the net income of other moneyed capital. It also permitted one kind of tax upon the bank itself (*People* v. *Loughman*, 100 Fed. [2d] 387), namely, a tax on the net income of the bank itself at a rate no higher than the tax on other corporations. It was provided that "the imposition by said State of any one of the above three forms of taxation shall be in lieu of the others."

After that amendment of § 5219, the Legislature of Massachusetts enacted St. 1923, c. 487, and amended it by St. 1924, c. 233. By these statutes, G. L. (1921) c. 63, § 1, was amended slightly, in one place by expressing the rate of local taxation of bank shares as "the same rate as is assessed upon other moneyed capital in the hands of individual citizens coming into competition with the business of national banks." Originally the somewhat similar words of G. L. (1921) c. 63, § 1, had meant the local rate of taxation, for other moneyed capital was assessed at that rate to individuals. Now, with the advent of income taxes on individuals, these words referred (apart from rates of taxation upon competing corporations, *A. J. Tower Co.* v. *Commonwealth*, 223 Mass. 371) to income taxes on individuals using moneyed capital in competition with national banks. The ad valorem tax on national bank shares had to be compared with a wholly different kind of tax on individual income, in order that the "rate" of the latter might govern the former. The statute meant that the practical burden of each should be the same. The tax on national bank shares remained an ad valorem tax, and the question was, what amount of tax assessed upon such shares would impose on their owners a burden equal to that of the income tax on competing individuals. *Central National Bank* v. *Lynn*, 259 Mass. 1, 11–13. The fact that an individual having no net income would be subject to no income tax did not prevent some taxation of national bank shares ad valorem. The amount of the tax under c. 63, § 1, as amended in 1923, could be determined only by the ascertainment of complicated facts and the making of difficult comparisons. Much litigation could have been expected. But some tax on the shares of the petitioning bank was doubtless assessable to the stock-

holders, even though it had no net income for the year. *Central National Bank* v. *Lynn,* 259 Mass. 1, 11 et seq.; *S. C.* 266 Mass. 145.

Those Massachusetts statutes of 1923 and 1924, moreover, inserted a new section 10A in G. L. (1921) c. 63, whereby each national bank was given an annual election to be assessed and to pay a wholly different tax in lieu of the tax under c. 63, § 1, as thus amended. A bank so electing was freed for the year from any tax under that section, c. 63, § 1, as amended, and was taxed instead twelve and one half per cent of its net income for the year, but (under the amendment to said § 10A inserted by the 1924 statute) in no event less than six per cent of the dividends paid to its stockholders during the year. Those statutes remained in force with respect to taxation for the years 1923, 1924, and 1925. St. 1925, c. 343, §§ 1, 13. St. 1926, c. 222.[1]

In 1923 and 1924 the petitioning bank had no net income, but suffered a loss in each year. But in each year it paid substantial dividends to stockholders out of accumulated surplus. In 1924 and 1925 it duly filed elections under § 10A[2] to be taxed under that section with reference to income or dividends of the preceding year. The respondent commissioner assessed upon it in each year a tax of six per cent of the dividends paid in the preceding year. The bank paid those taxes under written protest, and later brought these petitions.

It may be conceded that a tax on nonexistent income, with a minimum measured by dividends paid, was not within the permission given by § 5219 as amended in 1923. *Hoeper*

---

[1] For the history of the struggle in Massachusetts to find a method of taxation of national banks or their stockholders, not in conflict with the Federal Constitution or statutes, see 7 Op. Atty. Gen. 540; Nichols, Taxation in Massachusetts (3d ed. 1938) 558–562; Final Report of the Commission to Investigate the Operation of the Laws relative to the Taxation of Certain Banking Institutions, 1925 House Doc. 233.

For the present law, see Act of March 25, 1926, c. 88 (44 U. S. Sts. at Large, 223); U. S. C. Title 12, § 548; G. L. (Ter. Ed.) c. 63, §§ 1–4, 7, as since amended; *Tradesmens National Bank* v. *Oklahoma Tax Commission,* 309 U. S. 560.

[2] The document filed by the bank in each case read: "The . . . bank hereby elects and agrees to be taxed in and for the year . . . in lieu of the tax provided by section one of chapter 63 of the General Laws, as amended, upon its net income in accordance with the provisions of section 10A of said chapter 63 as amended." — REPORTER.

*v. Tax Commission of Wisconsin,* 284 U. S. 206, 215. *Commissioner of Corporations & Taxation* v. *J. G. McCrory Co.* 280 Mass. 273, 280. Such a tax was at best a mixture of two permitted forms of taxation, whereas the Federal statute gave a State a choice of only one of three forms. *Buder* v. *First National Bank,* 16 Fed. (2d) 990.

But this alternative tax was optional with the bank, and was payable only at its election. The bank could have chosen instead to pay the tax, doubtful in amount, lawfully assessable under c. 63, § 1, as amended. By electing the alternative tax, the bank gained certainty in place of uncertainty, settlement in place of a long and expensive controversy. In reliance upon that election, the public authorities made no attempt at local taxation of its shares. Although the tax elected was one upon the bank itself, that made little if any practical difference to the bank or its stockholders. The statute was in effect an offer of compromise of a troublesome controversy, and the bank elected to accept the offer. It is immaterial that the amount paid by the bank in compromise was called a tax, or that a tax of that sort, apart from a contract of compromise, would not have been collectible. *Burr* v. *Wilcox,* 13 Allen, 269. The amount was paid voluntarily, without any duress, upon valuable consideration furnished by the Commonwealth. It is not shown that the bank and its stockholders did not profit by the course it elected to take. There was nothing ultra vires in its election to compromise. A bank is not required by law to choose between submission to unlawful taxation, and carrying controversy to the end. It has a right sensibly to adopt a middle course, as it did in this case. The compromise made amounted to a contract between the Commonwealth and the bank, and is not to be set aside except upon some ground destroying its validity as a contract. *Collector of Taxes of Boston* v. *National Shawmut Bank,* 259 Mass. 14. See also *Central Trust Co.* v. *Howard,* 275 Mass. 153, 156; *Clement National Bank* v. *Vermont,* 231 U. S. 120.

The election in 1925 was made after a minimum tax provision had been inserted in § 10A. That election, we hold,

accepted that minimum tax provision. Therefore the petitioning bank cannot maintain its petition with reference to the tax assessed in 1925. In 1924 the petitioning bank filed its first election on March 11, 1924, before St. 1924, c. 233, inserting the minimum tax provision, took effect on April 12, 1924. At that time, as appears by a return filed within fifteen days thereafter, it had been determined that the bank had no net income for 1923, and consequently that no tax could be due under § 10A as it existed before the amendment made on April 12, 1924, by St. 1924, c. 233. This the bank does not deny. Since there was then no tax assessable under said § 10A as it existed prior to St. 1924, c. 233, because there was no net income, the election filed on March 11, 1924, created no contract binding the Commonwealth, because of lack of consideration furnished by the bank. The case in this respect is not governed by *Collector of Taxes of Boston* v. *National Shawmut Bank,* 259 Mass. 14, because in that case the bank apparently was taxable under § 10A as it existed before the amendment of 1924. The later election filed by the bank in the present case on April 15, 1924, after a minimum tax had become assessable under § 10A by the amendment made on April 12, 1924, by St. 1924, c. 233, created a valid contract binding both the bank and the Commonwealth by reason of consideration furnished by each party. In each case the entry will be

*Petition dismissed with costs.*